Francis W. ISCHAY, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.

No. ED CV 04–1696–PJW.

United States District Court, C.D. California.

July 27, 2005.

Steven G. Rosales, Lawrence D. Rohlfing Law Offices, Santa Fe Springs, CA, for Plaintiff.

Kathryn M. Ritchie, Assistant U.S. Attorney, Office of U.S. Attorney, Los Angeles, CA, for Defendant.

## MEMORANDUM OPINION AND ORDER

WALSH, United States Magistrate Judge.

### I.

### INTRODUCTION

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking reversal of the decision by Defendant Social Security Administration ("Agency") denying Supplemental Security Income ("SSI") benefits. Alternatively, he asks the Court to remand the case to the Agency for further proceedings. For the reasons discussed below, the Agency's decision is REVERSED and the case is REMANDED for the award of benefits.

### II.

### BACKGROUND

Plaintiff was born on February 2, 1934, and was 69 years old at the time of the relevant administrative hearing. (AR 465.) He is a high-school graduate, with three years of college-level training in engineering and economics. (AR 51, 465.) He has past relevant skilled work as a production superintendent for an alumi-

num distribution company. (AR 51, 465–66.)

Plaintiff filed protectively for SSI benefits on January 17, 1995. (AR 464.) In his application, he alleged disability since April 4, 1994, because of hypertension and low back pain. (AR 51.) Plaintiff timely requested a hearing before an administrative law judge ("ALJ") after his claim was denied initially and on reconsideration. (*See* AR 50, 107.)

Over the years, various ALJs held four hearings on Plaintiff's application. Although only the decision that followed the ultimate hearing is at issue in this case, the substance of all four hearings and the evidence introduced at each is relevant because of Plaintiff's assertion of the doctrine of law of the case. Accordingly, the Court will summarize the four hearings in chronological order.

A. *The First Hearing (October 16, 1996)*

The first hearing was held on October 16, 1996. (AR 70.) Plaintiff appeared with counsel and testified. (*See* AR 72–85.) The ALJ also heard testimony from Alan Boroskin, a vocational expert. (*See* AR 86–95.)

At the first hearing, Plaintiff stated that he finished three years of college course work in engineering and economics. (*See* AR 72–73.) He explained that he had last worked in 1994, overseeing production and quality-control at an aluminum manufacturing plant. (AR 73–74.) Plaintiff's general duties were supervisory in nature; his specific duties involved walking, retrieving data from a computer, making phone calls, occasional local travel to visit suppliers of raw materials, and hiring and firing. (*See* AR 74–76.) Beginning in 1993, Plaintiff became responsible for supervising three

shifts. (AR 76–77.) The stress of these additional duties led him to quit this job in 1994 "[u]nder doctor's recommendations because of elevated blood pressure, hypertension." [1] (AR 76.)

Plaintiff's doctor prescribed medication for his blood pressure and recommended stretching exercises and non-prescription doses of Tylenol as needed for his back. (*See* AR 77–81.) His daily activities included watering the lawn, cooking, watching television, reading, working on his home computer, and corresponding with family. (AR 80–82.) Occasionally, Plaintiff also relaxed at his motor home by the beach. (AR 81.)

Regarding his functional limitations, Plaintiff stated that he had sporadic difficulty walking; on bad days, he used a back brace, support brace, and a cane, although he admitted that "[r]ight now I could probably walk easily enough." (AR 82.) Plaintiff estimated that he sat at his computer for no more than one hour at a time. (AR 83.) He added that his ability to bend at the waist was limited and described muscle spasms in his back; again, however, he admitted that "I can go into the grocery store, shop, carry it out and probably do okay." (*See* AR 83.) Plaintiff considered his hypertension to be the most significant impediment to his return to work. (AR 83–84.)

The ALJ next heard testimony from Alan Boroskin, the Vocational Expert. (AR 86.) According to the Dictionary of Occupational Titles ("DOT"), this expert considered that Plaintiff's previous job was skilled labor performed at the light exertional level. (AR 86.) The expert added that, given Plaintiff's particular duties—which involved responsibility for seven de-

---

**1.** A Worker's Compensation claim that Plaintiff brought against his employer settled in January 1996 for approximately $12,000. (AR 85.) The record contains the transcript of the deposition testimony that Plaintiff had given in December 1994, during the pendency of that Worker's Compensation proceeding. (*See* AR 11–40.)

partments and supervision of approximately 100 employees—the stress level of this job would rate at approximately an 8 on a scale of 1 to 10, with 10 indicating the highest level of stress. (*See* AR 86.)

The vocational expert found that many of Plaintiff's skills were transferable to other, less stressful work. Specifically, the expert explained that Plaintiff could perform jobs as a reader, an automobile locator, or in administrative support—all of which were less stressful than his previous work, and each of which involved a lower general level of skill and existed in significant numbers in the local economy. (*See* AR 87–90.) Even if none of Plaintiff's skills was transferable, the expert concluded that he still could perform unskilled jobs existing in large numbers in the national economy, including cleaner—a relatively low-stress job performed at the medium-level of exertion for which 81,000 positions existed in the local economy. (*See* AR 86–87.)

In response to Plaintiff's counsel's hypothetical questions, the vocational expert opined that, even if Plaintiff had a marked or significant limitation in his ability to accept instructions and respond appropriately to criticisms from supervisors, he would not be significantly limited in his ability to perform these other jobs. (*See* AR 93.) The expert conceded, however, that if Plaintiff had a marked limitation in his ability to maintain attention and concentration for longer than two hours at a time, he would be unable to perform any of these other jobs. (AR 92–93.)

On January 24, 1997, after analyzing Plaintiff's claims under the Agency's five-step sequential evaluation process, the ALJ issued the first decision. (AR 50–60.) Based on his assessment of the medical record, the ALJ determined that, although Plaintiff's last position was too stressful for him, he remained capable of performing any position he held at his company before becoming responsible for managing three shifts of employees. (*See* AR 58.) Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in the Social Security Act (the "Act") at any time through the date of that first decision. (AR 60.)

Plaintiff timely requested review of the first decision. (AR 41.) The Appeals Council affirmed the decision. (*See* AR 3–4.) Plaintiff then filed suit in this Court, and, on June 15, 1999, Magistrate Judge Ann I. Jones reversed. (AR 385–95.) Primarily, the Court faulted the ALJ's step four conclusion that Plaintiff could return to his previous work, observing that there was no evidence that he ever performed the discrete "jobs" that the ALJ considered him capable of resuming. (AR 389–91.) The Court found, instead, that the "evidence supports the conclusion that [P]laintiff would be precluded from performing any of his prior work." (*See* AR 391.) Additionally, the Court noted that the ALJ offered inadequate reasons for his dismissal of Plaintiff's subjective pain complaints. (AR 392–94.) On remand, therefore, the Court instructed the ALJ "to complete the five-step evaluation." (*See* AR 394.) The Court entered summary judgment in favor of Plaintiff, and remanded the matter to the Agency with the usual mandate to conduct "further administrative action consistent with this Memorandum Opinion." (AR 395.) Pursuant to Magistrate Judge Jones's Order, the Appeals Council vacated the first decision and remanded the matter to a different ALJ for additional proceedings. (*See* AR 382–83.)

B. *The Second Hearing (January 12, 2000)*

On remand, a second administrative hearing was held on January 12, 2000, before a different ALJ. (AR 328.) Once

more, Plaintiff appeared with counsel and testified. (*See* AR 330–53.) The ALJ also heard testimony from Randi Hetrick, another vocational expert. (*See* AR 353–378.)

At the second hearing, Plaintiff testified at length about his overall financial situation. He told the ALJ that, since he left his job, he continued to live with his wife in their home, which they had owned for 30 years. (AR 336–37.) Additionally, he admitted that he had been receiving early retirement benefits from the Agency since 1996.[2] (AR 332, 337.) He also confirmed that he had settled his Worker's Compensation claim for $12,000, and that the lump-sum settlement left him responsible for his own continuing medical care. (AR 343–44, 347.) Plaintiff further testified that, although he had left his company on disability, his company retirement benefits had vested thereafter; under that pension plan, he had received payments totaling approximately $48,000 over a one-year period, and then no further pension payments thereafter. (*See* AR 346, 352–53.)

Plaintiff recapitulated some of his earlier testimony about his work history for the benefit of the new ALJ. (*See* AR 332–34.) He admitted that the reasons his doctor considered him unable to return to his job in 1994 were the stress level of that job and his hypertension disease, although he added his stress manifested itself in "nightmares and mental problems." (*See* AR 345, 349.) He conceded that he "would rather avoid going to doctors," but claimed that he followed their advice and took his prescribed medication religiously. (AR 344.) Plaintiff explained that he had stopped working on the advice of his doctor in 1994, who was then having difficulty controlling his blood pressure with medication; following Plaintiff's separation

from the company, his blood pressure dropped considerably and, by 2000, his hypertension was controlled with medication, although it still fluctuated. (AR 345.) He explained that the only time he stopped taking one of his blood pressure medications was in 1997, when his blood pressure had become dangerously *low*. (*See* AR 351–52.)

Plaintiff also clarified the responsibilities he held throughout his career with his former employer. He explained that he had held only two jobs during the previous 15 years: that of assistant plant manager until 1993, and that of plant manager from 1993 until he left the company in 1994. (*See* AR 336, 347–48.) He estimated that, during one of his usual nine-hour workdays as plant manager—his last position at the company—he spent six hours on his feet, and three hours at his desk retrieving data from his computer. (AR 335.) As assistant plant manager, Plaintiff estimated that he spent six hours sitting at his computer, and four hours on his feet. (AR 335–36.) On the 1–to–10 scale, Plaintiff stated that, if the stress of his final job as plant manager rated an "8," then the stress he had felt in his previous job as an assistant plant manager rated a "7." (AR 336.) Plaintiff could not explain what about his new position made his stress level unmanageable after 1993. (AR 348.) He explained that his hypertension required him to avoid stressful situations, including social events, interactions with strangers, or conflicts of any kind—some or all of which happened on a daily basis during his previous jobs as assistant plant manager and plant manager. (AR 343.)

Additionally, Plaintiff described his physical limitations and explained how they affected his functional capabilities.

---

**2.** Plaintiff turned 65 on February 2, 1999; thus, he had reached retirement age by the date of the second hearing. (*See* AR 298–99.)

Accordingly, the period at issue spanned the alleged onset date of April 5, 1994 to December 31, 1998. (AR 299.)

He stated that he helped his wife by vacuuming, cooking, and shopping, and admitted that he could stand, sit, and walk for up to one hour intervals. (AR 337–38, 341.) He added that changing positions was "one of the most difficult things" for him because of chronic sciatica and told the ALJ that, since 1994, he occasionally used a cane or a walker when his back pain was intense. (AR 341.) He claimed that, when his back was out—which occurred once every three months or so—he would be unable to move at all for a week to 10 days at a time. (AR 342.) He admitted, however, that his doctor had not ordered an MRI of his spine until 1996 and conceded that, when his back was not bothering him, he could lift up to 20 pounds most of the time. (AR 342, 351.)

Finally, Plaintiff explained how his functional limitations affected his daily activities. Specifically, although Plaintiff enjoyed gardening and fishing, he explained that he had given up gardening altogether by October 1996, and had not gone fishing since 1997. (AR 338–39.) He stated that he continued to read and correspond with relatives by computer, but added that his online trading had become less frequent since the first hearing. (AR 339–40.) He added that, although he still attended Catholic church services weekly, his back problems interfered with his participation insofar as he was unable to kneel as much as he had in previous years. (AR 340.)

The ALJ next heard testimony from Randi Hetrick, a vocational expert. (AR 353.) Ms. Hetrick testified that the nearest analogue in the DOT for the job that Plaintiff held for the longest period of time—that of assistant plant manager, which he had held until 1993—was that of "production superintendent"; she further added that Plaintiff's post–1993 duties as plant manager appeared to be covered by the DOT's category of "branch manager." (AR 354–56.) This expert stated that both

were management jobs and that both involved a specific vocational preparation ("SVP") rating of 8 on a scale of 1 to 8, with 8 being the highest level of skill. (*See* AR 357–58.) Ms. Hetrick noted, however, that the duties of a branch manager would include all the duties of a production superintendent, plus additional duties, and that Plaintiff's post–1993 work would be classified as between light and sedentary, and that his pre–1993 job would be light work under the DOT. (*See* AR 355–60.)

She also explained that Plaintiff had acquired transferrable skills as a result of his experience. Generally, Ms. Hetrick testified that both of Plaintiff's positions with his former company involved transferrable skills in understanding budgets, monitoring product standards, scheduling, and staffing. (*See* AR 360–61.) More specifically, she opined that Plaintiff's skills were transferrable to the position of warehouse supervisor (a light-duty position with an SVP of 7), and to customer technical services manager, a sedentary position with an SVP of 8. (AR 362.) She explained that, although there had been a "flattening out" in demand for production skills in Plaintiff's industry over the past few years, the demand for warehouse skills remained strong overall, particularly in other industries. (*See* AR 363–67.)

The ALJ then asked the expert "to assume an individual 60 years of age, which is a person closely approaching retirement age." (AR 368.) Additionally, the ALJ stated:

> I'd like for you to assume that [ . . . ] the individual's exertional limitations would permit the individual to perform a full range of medium work. I would like for you to assume an individual with a 12th grade formal education and three years of college, no special degrees conferred. Past relevant work being skilled at the light and/or sedentary level.

(AR 368.) These assumptions would supply the groundwork for several specific hypothetical questions the ALJ intended to ask the vocational expert.

Having lain this foundation, the ALJ then posited the first of three hypothetical questions. Specifically, the ALJ asked:

I'd like for you to assume the individual is functionally impaired as a result of hypertension medically controlled and let's say susceptibility to stress. And the degree of stress will have to be posed separately. For the purpose of the first hypothetical let's assume that the hypertension is medically-controlled and, therefore, non-severe. [....] [¶] And let's assume that the stress is not medically controlled but is beneath the moderate level. Let's say it is severe but, and by severe it means it's effective but it's not moderate, it's mild, manageable.

(*See* AR 368–69.) Under the assumptions posited in this first hypothetical question, the expert opined that this person would be able to perform either of Plaintiff's past relevant jobs. (AR 369.)

The ALJ then refined his assumptions and posited a second hypothetical question to the expert. Specifically:

Now let's assume the same vocational profile and let's assume also that the hypertension is medically controlled and, therefore, non-severe and non-contributory. Let's assume that the stress is not medically controlled but the effect is moderate, which means it would severely affect the ability to perform the job. But it would not preclude the performance of the job, the individual could perform the job except that he would be laboring under some degree of impairment. Would an individual with that vocational profile, in your opinion, still

be able to perform [Plaintiff's] past relevant work?

(AR 370–71.) On the assumption that this second hypothetical person would still be able to perform all of the requirements of the jobs, the vocational expert again opined that he could return to perform Plaintiff's previous jobs. (AR 370.) The vocational expert also considered this second hypothetical person capable of performing "any of the jobs to which the individual has transferable skills," including that of warehouse supervisor and customer technical services manager. (*See* AR 362, 371–72.) Additionally, the expert stated that this second hypothetical person could perform a full range of light to medium unskilled jobs existing in significant numbers in the national economy.[3] (AR 372.)

The ALJ further refined his assumptions in a third hypothetical question to the vocational expert:

Now my first hypothetical, let's say if the ability to do the job on a scale of one to five and the mild would be as the two out of a five. Moderate being the three out of the five. [....] [¶]. Now, I'd like to ask the same hypothetical except that the stress would be at a level of four or greater, which means it would be in the market [*sic*] to extreme, approaching extreme. [....] [¶] And it would hamper the job performance to such a degree that the individual would begin to experience absenteeism and also exhibit physical manifestations of stress which would, could be appetite loss, weight change, loss of sleep, nightmares, somatic symptoms of pain, itching, etc. In that case would the individual be able to perform [Plaintiff's] past relevant work?

---

**3.** Plaintiff's counsel waived the ALJ's next line of questioning, which had asked the vocational expert to list the specific unskilled jobs that this second hypothetical person could perform. (*See* AR 373.)

(AR 370–71.) On the assumption that this level of stress would be "consistent and progressive," the vocational expert opined that the third hypothetical person could not perform either of Plaintiff's previous jobs.[4] (*See* AR 371.)

Plaintiff's attorney then posed a fourth hypothetical question for the vocational expert. Assuming the same vocational profile that the ALJ had posited, and "further assum[ing] that the person is exertionally limited to the full range of medium work," (AR 373), Plaintiff's counsel asked:

I'd like you to further assume that the individual is not capable of being subjected to emotional stress of the strain on the job because of underlying labile hypertension and the results of stress, emotional stress and strain on him. [. . . .] [¶] The particular things that, that might cause stress in this individual that would need to be avoided, socializing and contact on more than a superficial level with, with strangers. Conflicts with any person, whether it be a stranger, coworker, underling. [. . . .] [¶] [Also,] supervisors. The individual cannot tolerate those work environments, would an individual with these limitations be able to perform [Plaintiff's] past relevant work?

(*See* AR 373–74.) Because Plaintiff's past relevant work would involve periodic conflicts with supervisors, coworkers, peers, underlings, and customers, the vocational expert opined that this hypothetical person could not perform Plaintiff's previous jobs. (*See* AR 375.) For that same reason, the expert stated that both of the transferrable-skills jobs that she had identified earli-er in the hearing would be precluded under this hypothetical. (*See* AR 362, 375.)

To ascertain how Plaintiff's inability to cope with stress would affect his ability to perform unskilled labor, counsel refined the hypothetical question. That fifth hypothetical question[5] asked the vocational expert to assume that:

[T]he changes in [the] physiology [of the fifth hypothetical person], the changes in his, his psycho dynamic make up over the years has, has made him basically intolerant to stress. Intolerant to, to conflict, that's just the way, just the way he is, okay? [. . . .] [¶] And I want you [to assume] for purposes of [this fifth hypothetical question that] the person can tolerate rare episodes of superficial conflict. [. . . .] [¶][He] could not handle direct criticism, conflict over job performance that happens on a regular basis, and could not, certainly could not handle the rigors of high production, assembly, packing, things of that nature. So we're basically looking for a low stress occupation [in the medium range of exertion].

(*See* AR 377.) Given these assumptions—"that the person can only rarely tolerate superficial conflict with anyone at any time," and excluding jobs with "any kind of production demands" on the logic that such jobs "move[ ] a person back into the jobs where there's going to be more contact with people"—the expert concluded that this fifth hypothetical person could not perform medium, unskilled jobs. (*See* AR 378.)

Based on these questions and the medical evidence, Plaintiff's attorney urged the

---

4. The ALJ assumed, without asking the vocational expert, that this third hypothetical person could not perform either of the two jobs to which Plaintiff's skill-set was transferrable. (*See* AR 362, 372.)

5. To emphasize that he was refining the fourth hypothetical question, counsel called this fifth question "4A." (AR 377.) In an effort to bring some clarity to the barrage of hypothetical questions posed at that second hearing, the Court will refer to hypothetical question "4A" as the fifth hypothetical.

ALJ to conclude that "[Plaintiff] is limited to, at most, light exertion jobs, that he has no transferrable skills and that, therefore, he is incapable of making a vocational transition to that narrow range of work." (*See* AR 379–80.) The ALJ then adjourned the hearing. (AR 380.)

On July 27, 2000, after analyzing Plaintiff's claims under the Agency's five-step sequential evaluation process, the ALJ issued the second decision. (AR 298–305.) Based on his assessment of the medical record, the ALJ accepted Plaintiff's treating physician's conclusion that he was "limited to essentially light exertional work during the period at issue." (AR 300.) The ALJ determined that Plaintiff was not disabled at step five of the process, finding that Plaintiff could perform either of the two transferrable-skills jobs that the vocational expert had identified (*i.e.*, warehouse supervisor or customer technical services), (*see* AR 362), or could perform a range of light-exertional-level unskilled jobs existing in the national economy. (AR 303.) Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in Act at any time through December 31, 1998. (AR 303–05.)

As before, Plaintiff timely requested review of that second decision. (*See* AR 570–76.) The Appeals Council affirmed the decision. (*See* AR 585–87.) Once more, Plaintiff filed suit in this Court. Thereafter, the parties stipulated to a remand for the purpose of "obtain[ing] further vocational expert testimony to assist the ALJ in resolving the issue of vocational adjustment." (AR 577–78.) The Court accepted the stipulation and "remanded for further proceedings, under the fourth sentence of section 405(g) of the [Act], 42 U.S.C. § 405(g)." (*See* AR 580–81.) Accordingly, the Appeals Council once again vacated the decision and remanded the matter to the same ALJ who had conducted the second hearing. (AR 583–84.)

### C. *The Third Hearing (March 17, 2003)*

Pursuant to the stipulated remand order, a third hearing was held before the same ALJ on March 17, 2003. (AR 599.) Once more, Plaintiff appeared with counsel and testified. (*See* AR 603–07, 616–17.) The ALJ also heard testimony from Freeman Leeth, a new vocational expert. (*See* AR 607–16.)

Plaintiff clarified his duties at his previous job. Specifically, he told the ALJ that he was responsible for filling orders for sheeted aluminum and making delivery on those orders to customers on short notice. (*See* AR 603–04.) Although his duties during his 30–year tenure at the company always involved supervisory tasks, in his final job as plant manager he supervised 100 to 125 employees who worked 24 hours per day over three shifts. (*See* AR 603–04.) Additionally, Plaintiff was responsible for hiring new employees, firing existing employees by seniority, and for ensuring the safety of his workforce. (AR 606–07.)

Freeman Leeth, the vocational expert, also testified. (AR 607.) Mr. Leeth agreed with the previous vocational expert's conclusion that Plaintiff's prior work involved warehouse supervision, a light-duty job with a SVP of 7 on the 8–point scale. (AR 608.) The ALJ then asked Mr. Freeman:

> Assume an individual 60 years old, approaching retirement, with 12th grade plus education and past relevant work, skilled. [ . . . . ] I'd like for you to further assume that I find [Plaintiff] is functionally impaired as a result of the following-hypertension, which is, during the period in question, is medically controlled, degenerative joint disease of the spine which is mild and has not resulted in a significant level of a decrease in range of motion[,] and a stressful condition brought on by the working environment and such activities as having to

meet deadlines and having to fire people who had families, et cetera, and I'd like for you to assume that these stressors were the regular stressors that would normally be encountered by a supervisor or manager in a supervisory position and I would like for you to assume that the functional limitations caused by these functional impairments were mild or less than severe and that, as a result of the limitations, the individual was limited to light exertional activities and no other vocational functional limitations. In your opinion, would an individual with that vocational profile be able to perform the job of a warehouse supervisor or manager as it was performed by [Plaintiff]?

(AR 608–09.) In response to the vocational expert's request for clarification, the ALJ explained the hypothetical question as follows:

All three [of Plaintiff's limitations], in combination, result in a severe functional impairment but any one of the three, taken by itself, would not be severe. However, considering all three in combination and considering that they together meet the threshold requirement of being severe, and, therefore, would not be a step two decision but would take us to step four, which is considering whether or not the individual could perform the past relevant work of the job which requires the testimony of a vocational expert to give us an expert opinion as to whether or not the three limitations, in conjunction, together, would result in a condition that would be functionally limiting to such an extent that the individual would not be able to perform the job duties of the past relevant work of [Plaintiff]?

(AR 611.) The vocational expert opined that this hypothetical person could not perform Plaintiff's past relevant work. (See AR 610–11.)

Counsel then questioned the vocational expert. Despite counsel's argument that Plaintiff is "presumptively not able to perform unskilled work," the expert opined that the person described in the ALJ's hypothetical could, indeed, perform some unskilled jobs. (See AR 611–12.) Counsel surprised the ALJ by abruptly abandoning this line of questioning, but explained why he had done so:

The vocational expert has stated that the only type of job that [Plaintiff] could perform would be some type of unskilled work but the, I believe the Commissioner has presumptively concluded at step five, that where an individual such as [Plaintiff] at the same age, education and exertional level, has only the unskilled occupations available to him or occupations that require no transferrable—or where an individual has no transferrable skills, [Plaintiff] is presumptively considered disabled under the rules and under the [Act], notwithstanding Mr. Leeth's expert opinion.

(AR 612.) Nevertheless, counsel posed another hypothetical question to the expert:

[A]ssume an individual was limited, as the [ALJ] has stated, to light work, who is 60 years old with a 12th grade education who has the impairments as described by the [ALJ], the combination of hypertension, degenerative joint disease, which is mild, and a stress limitation. Now, the stress limitation is preclusion from any stress that's more than slight and to provide you a definition of that, I would simply say that it's—that anything more than slight would mean that it would severely affect the ability to perform the job.[6]

---

6. Counsel added that his definition of the stress limitation tracked the definition that the ALJ had adopted at the second hearing. (Compare AR 369–70 with 614–15.)

(AR 614–15.) The expert opined that no unskilled jobs would be available for this hypothetical person. (AR 615.)

On the basis of this testimony, Plaintiff's counsel argued that he was disabled from the date of onset to his 65th birthday. (AR 615.) The ALJ then adjourned the hearing. (AR 617–18.)

## D. *The Supplemental (Fourth) Hearing (November 13, 2003)*

The ALJ conducted a supplemental, or fourth, hearing on Plaintiff's application on November 13, 2003. (AR 619–51.) The ALJ explained that the supplemental hearing was "strictly for the purpose of vocational expert testimony." (AR 621.) For the supplemental hearing, the ALJ did not re-call vocational expert Freeman Leeth; instead, he called Steven Berry, a new vocational expert. (AR 619–21.) Counsel for Plaintiff objected, and the following colloquy occurred:

ALJ: [. . . .] State your objection.

ATTY: As your Honor knows, this matter is before you on a District Court remand. We did have that hearing pursuant to district court remand back in March [2003], where the vocational expert, Mr. Leeth, did testify and testified based on his knowledge of [Plaintiff's] past relevant work, that based on the limitations that [Plaintiff] suffers from, he's unable to return to that work and also doesn't possess any transferrable skills to any other work industry. [. . . .] [¶] I don't know why we're here today, your Honor, and I'd like—and I've written your Honor asking him why we're here today and I have no idea and [Plaintiff] has no idea and he'd like to know.

ALJ: Well, he's here because I have called a hearing and because I'm going to take testimony from a [vocational expert]. That's why you're here.

ATTY: Well, we took the testimony of Freeman Leeth. There was no objection to Mr. Leeth's testimony, neither I nor yourself and he's your own expert. So it was—I mean, if there was a problem with Mr. Leeth's testimony, why isn't Mr. Leeth here to address those difficulties or problems? I mean, we just can't ignore Mr. Leeth's testimony. (*See* AR 622–23.) The ALJ did not then explain his reasons for the fourth hearing, but simply stated: "Your objection is overruled." (AR 623.) At the conclusion of the administrative hearing, however, the ALJ chastised counsel for making the objection, stating:

Counsel, let me say this. You do your client a disservice by presuming to tell the [ALJ] how many witnesses to call and to lecture the court on how to conduct a hearing. If you don't know why you're here, you give your client little confidence in your abilities, as an advocate. I expect more than that from a licensed Member of the Bar.

(AR 650.)

The vocational expert then began by questioning Plaintiff directly about his employment history. For the benefit of the new expert, Plaintiff recapitulated much of the employment history he had attested to at the prior hearings. (*See* AR 624–30.) The expert stated that the most appropriate DOT category for Plaintiff's prior work was that of production superintendent, a job performed at the light level of exertion with an SVP of 8 on the eight-point scale. (AR 631.) Mr. Berry also added that several skills Plaintiff had acquired—including knowledge of the manufacturing process, production requirements, and warehousing and report-writing skills—would be transferrable to other jobs and highly marketable, even outside the industry in which Plaintiff honed them. (AR 631–32.)

More specifically, the vocational expert opined that Plaintiff's skills would transfer to the DOT positions of manager of a distribution warehouse, warehouse supervisor, warehouse traffic supervisor, stock supervisor, and warehouse records clerk, all jobs with an SVP of 5 to 6, each performed at the sedentary or light exertional level, and none of which required an adjustment period longer than one month. (*See* AR 631–32, 636–39.) The expert explained that these positions existed in significant numbers in the local economy, including 400 to 500 positions for manager of a distribution warehouse, 2400 positions for warehouse supervisor, fewer than 300 jobs for warehouse traffic supervisor, an estimated 1000 positions for stock supervisor, and approximately 700 jobs for warehouse records clerk. (AR 632–34.)

The ALJ then posed several hypothetical questions to this vocational expert. The first hypothetical question was:

Assume that I would find [Plaintiff] able to perform a full range of light work. Assume an individual 60 years old, which is a person closely approaching retirement age. Assume the individual has a 12th grade formal education, past relevant work has been skilled with transferrable skills at the light exertional level. [ . . . . ] Assume further that the individual is functionally impaired as a result of the following diagnoses—hypertension, degenerative joint disease, and stress. Assume that the stress is caused by meeting deadlines, having to fire people, all the other duties that are inherent in making management decisions. Assume that the hypertension is medically controlled and that the degenerative joint disease is mild, with no significant functional limitation. Based on that hypothetical, given those exertional and nonexertional impairments and the degree of functional limitations, in your opinion, would that individual be

able to perform [Plaintiff's] past relevant work?

(AR 634.) The expert opined that this first hypothetical person could perform Plaintiff's past work. (AR 635.)

The ALJ then posited a second hypothetical question, as follows:

Let's assume the same vocational profile, the same functional limitations, degree of impairment. Let's assume further that the individual would not be able to perform the past relevant work of [Plaintiff], but considering the skills that [Plaintiff] has and the jobs to which he has transferrable skills [ . . . . ]

(AR 635.) The vocational expert opined that this hypothetical person should be able to perform the jobs of warehouse supervisor, stock supervisor, manager of a distribution warehouse, warehouse traffic supervisor, and warehouse records clerk. (AR 635.) The expert admitted that he had not performed an on-site job analysis for these positions in preparation for Plaintiff's hearing, although he stated that he had conducted that analysis before testifying in other matters. (AR 645–46.)

Plaintiff's attorney then posed a hypothetical question of his own to the expert.

[Assume an] individual is limited to the light range of work exertionally, as we all understand the definition, 20 pounds occasionally, 10 pounds frequently, sitting, walking or standing or—or standing, walking, and sitting for six hours out of an eight hour workday, but they suffer from a stress condition which is moderate, which I'll define as severely affecting the ability to perform the job. It doesn't preclude the ability to perform the job but I'll quantify it for you. By severe, I mean up to, from one-third to two-thirds of the workday. Okay. They suffer from stress. Okay. Or they suffer from a condition, which if stress is entered into it, they'll experience it.

Okay. Now could that individual perform the past relevant work?

(AR 646–47.) The expert opined that this person could not perform Plaintiff's past relevant work or any of the five other jobs he had identified, even if his stress severely affected his ability to perform his job for only one-third of the workday. (*See* AR 647–48.) When counsel modified his hypothetical to posit a person who could tolerate "more than [a] slight amount of stress," quantified as "no more than 10 percent of the workday," the expert still concluded that this person could neither perform Plaintiff's past relevant work nor any of the five other transferrable-skill jobs he had identified. (*See* AR 648–49.)

On January 9, 2004, after analyzing Plaintiff's claims under the Agency's five-step sequential evaluation process, the ALJ issued a third decision. (AR 464–47.) At the outset, the ALJ explained that he had ordered testimony from a new vocational expert at the fourth hearing because he considered Freeman Leeth's testimony at the third hearing to be "deficient and illogical." (AR 465.) The ALJ then explained why the testimony of expert Steven Berry at the fourth hearing was superior to that previously given by Mr. Leeth:

> Stephen [*sic*] Berry, another vocational expert[,] was called to testify. Unlike Mr. Leeth, Mr. Berry has the latest Department of Labor statistics and a laptop computer with the D.O.T. downloaded as software. Mr. Berry, like Ms. Randi Hetrick at the first hearing in January 2000, was able to identify the D.O.T. code for [Plaintiff's] past work. Mr. Berry's testimony was more persuasive and probative than that obtained from Mr. Leeth, and is thus adopted herein.

(AR 465.) Otherwise, the ALJ incorporated the evaluation of the evidence in the first and second decisions, "but not the findings or conclusion[s] obtained therefrom." (AR 466.)

At step one, the ALJ found "no indication that [Plaintiff] engaged in substantial gainful activity during the period at issue." (AR 466.) Proceeding to step two, the ALJ found that Plaintiff's hypertension, stress, and degenerative disc disease were all "severe" within the meaning of the regulations. (AR 467.) At step three, however, the ALJ found that Plaintiff's combined impairments were not severe enough to meet or medically equal a Listing. (*See* AR 467.) The ALJ found Plaintiff not disabled at step four, stating "[t]he vocational expert testified that an individual with the above-stated functional limitations would not be precluded from performing the work of a production superintendent." (AR 466.) Having concluded that Mr. Berry's testimony established that Plaintiff's "functional limitations did not preclude him from performing his past work," (AR 467), the ALJ explained that this Court's December 12, 2001 Order instructing him to reach step five was "moot." (*See* AR 466.)

Plaintiff was invited to seek Appeals Council review of the third decision, but did not do so. (*See* AR 461–63.) Accordingly, by operation of the regulations, the third decision of the ALJ became the final decision of the Agency. *See* 20 C.F.R. § 404.984(a). Plaintiff then filed suit in this Court for a third time.

### III.

### STANDARD OF REVIEW

■ "Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Court may overturn the ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or is based on legal error. *See Magallanes v. Bowen,* 881 F.2d 747, 750 (9th Cir.1989).

Substantial evidence " 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)(quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).) It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir.1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

 "The Court must uphold the ALJ's conclusion even if the evidence in the record is susceptible to more than one rational interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir.1999). Indeed, if the record evidence can reasonably support either affirming or reversing the Agency's decision, this Court must not substitute its judgment for that of the ALJ. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir.1999). If the ALJ committed error but the error was harmless, reversal is not required. *See Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1197 (9th Cir.2003)(applying the harmless error standard).

## IV.

## DISCUSSION

Plaintiff claims that the ALJ erred by (1) disregarding the doctrine of the law of the case by abandoning the residual functional capacity assessment he had made in the second decision; (2) concluding that Plaintiff's "severe impairments cause[d] no significant work-related impairment"; and by (3) engaging in "impermissible expert shopping." (*See* Motion at 6, 13, and 14.) For the reasons set forth below, the Court concludes that the ALJ's decision violated the law of the case and exceeded the scope of his mandate on remand. Accordingly, the Court reverses the ALJ's ruling on this basis without reaching Plaintiff's second and third arguments, and remands for the immediate award of benefits.

A. *This Court's Orders Are Enforceable Under The Rule Of Mandate, And Their Legal Conclusions Supply The Law Of The Case*

Plaintiff argues that, after this Court's Order of December 12, 2001 remanded the matter to Agency with instructions to reach step five, the doctrine of the law of the case precluded the ALJ from revisiting steps one through four of the sequential process. (*See* Motion at 6–12.) The Agency, on the other hand, contends that the doctrine is inapplicable because this is a different case than the one remanded and argues that, in any event, the 2001 Order did not purport to adjudicate Plaintiff's residual functional capacity. (*See* Cross–Motion at 2.) The Court finds that, to the extent the ALJ reopened the case beyond the issues identified in the June 15, 1999 and December 12, 2001 Orders of this Court, he violated this Court's mandate and adjudicated issues already settled by the law of the case.

 As a general principle, the United States Supreme Court has recognized that an administrative agency is bound on remand to apply the legal principles laid down by the reviewing court. *See F.C.C. v. Pottsville Broadcasting Co.,* 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656, (1940); *see also United Gas Improvement Co. v. Continental Oil Co.,* 381 U.S. 392, 406, 85

S.Ct. 1517, 14 L.Ed.2d 466 (1965)(explaining that the agency must act upon the court's correction on remand). More recently, the Supreme Court has recognized that the Agency is not free to disregard its marching orders on remand:

> Where a court finds that the Secretary has committed a legal or factual error in evaluating a particular claim, the district court's remand order will often include detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed. Often, complex legal issues are involved, including classification of the claimant's alleged disability or his or her prior work experience within the Secretary's guidelines or "grids" used for determining claimant disability. *Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review.*

*See Sullivan v. Hudson,* 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989)(emphasis added; citations omitted). Although *Sullivan* did not identify the particular legal doctrines supporting this conclusion, two come to mind: the doctrine of the law of the case, upon which Plaintiff relies (*see* Motion at 6–12), and the rule of mandate, which neither party discusses at any length.

■ Under the "law of the case" doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir.1993). As this summary reflects, the impact of the doctrine will vary, depending upon judicial perspective:

> The legal effect of the doctrine of the law of the case depends upon whether the earlier ruling was made by a trial court or an appellate court. All rulings of a trial court are subject to revision at any time before the entry of judgment. A trial court may *not,* however, reconsider a question decided by an appellate court.

*United States v. Houser,* 804 F.2d 565, 567 (9th Cir.1986)(emphasis in original).

■ The so-called rule of mandate "presents a specific and more binding variant of the law of the case doctrine." *See Magnesystems, Inc. v. Nikken, Inc.,* 933 F.Supp. 944, 949 (C.D.Cal.1996). The rule of mandate requires that, on remand, the lower court's actions must be consistent with both the letter *and the spirit* of the higher court's decision. *See Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)(looking to whether post-mandate conduct of lower court was consistent "with either the spirit or the express terms of our decision"). More specifically, the Ninth Circuit has explained the rule:

> The rule of mandate is similar to, but broader than, the law of the case doctrine. A district court, upon receiving the mandate of an appellate court cannot vary it or examine it for any other purpose than execution. Thus, a district court could not refuse to dismiss a case when the mandate required it, and a district court could not revisit its already final determinations unless the mandate allowed it[.]

*See United States v. Cote,* 51 F.3d 178, 181 (9th Cir.1996) (citations omitted). The Ninth Circuit has explained the interrelationship between the doctrine of the law of the case and the rule of mandate succinctly: "When acting under an appellate court's mandate, an inferior court is bound by the decree as the law of the case[.]" *See Vizcaino v. United States District Court,* 173 F.3d 713, 719 (9th Cir.1999).

The situation that brings both the doctrine of the law of the case and the rule of

mandate into play is, of course, one in which a decision-maker sitting in the capacity of a trial court acts in the wake of a remand by an appellate tribunal. *See Houser*, 804 F.2d at 567; *see also Viscaino*, 173 F.3d at 719. The hierarchical parallel is clear: In Social Security proceedings, the district court's position to the Appeals Council (and indirectly, the ALJ) is analogous to that of the court of appeals' position with respect to a trial court. One district court in our circuit has made note the relationship:

> Historically, the system has operated in hierarchical fashion with decisional power vested, in ascending order, in an [ALJ], the Appeals Council, the district court, the court of appeals, and the Supreme Court. The Supreme Court overrules appellate court decisions, not the other way around. The court of appeals overrules decisions of the trial court, not the other way around. And the district court overrules the Appeals Council, not the other way around.

*See Holst v. Bowen*, 637 F.Supp. 145, 147–48 (E.D.Wash.1986) (citations and footnotes omitted). The regulations are in accord with *Holst's* observation. *See* 20 C.F.R. § 404.983.

Within the confines of this hierarchy, and against this doctrinal backdrop, Plaintiff argues that the ALJ's third decision violated the law of the case as set forth in Magistrate Judge Jones's Order of June 15, 1999 (*see* Reply at 5–8), and exceeded the scope of the remand set forth in the Court's December 12, 2001 Order. (*See* Motion at 8.) After reviewing the remand orders issued by the Court in this case, the Court concludes that the ALJ abused his discretion by disregarding the Court's earlier orders and remand instructions.

No published opinion of the Ninth Circuit has applied the doctrine of the law of the case or the rule of mandate to preclude ALJs from relitigating issues settled in district court's orders. Consistent with the principles vindicated by both the rule and the doctrine, however, this Court has held that ALJs may not re-litigate issues already settled by their remand orders. In *Ruiz v. Apfel*, 24 F.Supp.2d 1045 (C.D.Cal.1998), for example, the Court addressed a claimant's argument that "the ALJ erred on remand by denying plaintiff's claim at step four, thereby reviewing—and redeciding—an issue that had previously been decided in plaintiff's favor and not appealed." *Ruiz*, 24 F.Supp.2d at 1050. The Court agreed with the claimant and remanded the matter for a second time, explaining:

> The remand order expressly stated that the case was being remanded to permit the ALJ to remedy the deficiencies in his decision by making complete credibility findings. The remand order did not authorize the Appeals Council or the ALJ to revisit the previous step-four determination that plaintiff could not perform her past relevant work.

*Id.* at 1050 (citation to record and footnote omitted). Although *Ruiz* did not invoke the doctrine of the law of the case or the rule of mandate, other district courts in our circuit have relied upon the doctrine or the rule in reaching the same result. *See Holst*, 637 F.Supp. at 147; *see also Pearson v. Chater*, No. C–95–1921–CAL, 1997 WL 314380, at *3 (N.D.Cal. Feb.20, 1997)(holding that, "[u]nder the law of the case doctrine, this court will not re-examine its legal decision that the ALJ had sufficient reasons to discount [a medical expert's] testimony"), *aff'd*, 141 F.3d 1178 (9th Cir.1998).

Although neither party cites it, *Holst* provides the most detailed explanation of the rationale for applying the doctrine to the Agency's post-remand actions. In *Holst*, in the wake of the ALJ's decision that the claimant was only entitled to

closed-end disability, the claimant filed suit in federal court; the district court granted his motion for summary judgment and remanded the case to the Agency with general instructions to the Agency to reconsider the matter in light of several then-recent Ninth Circuit authorities. Although the remand order also permitted the taking of additional evidence, "[n]othing in the order of remand even remotely suggest[ed] that granting plaintiff's motion in this limited regard concurrently gave the ALJ leave to conduct *de novo* proceedings." *Holst*, 637 F.Supp. at 145 n. 1. On remand, the ALJ specifically acknowledged the district court's remand order, noted that he considered the order to be erroneous, but stated: "It is immaterial that it is erroneous. It is the law of this case." *Id.* at 147 n. 3. Despite his lip-service to the doctrine, however, the ALJ "proceeded through the steps of a full sequential analysis, and based on prodigious new evidence taken during the supplemental proceedings, held that [the] claimant was not then disabled, and never had been." *Id.* at 146. When the plaintiff re-filed in federal court following the decision, the district court noted that its remand order had elevated the fact of plaintiff's disability during the closed period to "the law of the case and not subject to tampering in further administrative proceedings." *Id.* at 147. The Court emphasized that, "[w]here the district court is

itself in error, the Secretary is not without remedies. Among those remedies, however, is not the option of simply ignoring the mandate, nor, as in this case, of purporting to 'overrule' such perceived error." *Id.* at 147 (citations omitted). Given the ready availability of redress for erroneous decisions, the court stated that it would "refuse to condone an anarchical situation wherein the ALJ has presumed to substitute his function for that of the Ninth Circuit Court of Appeals." *Id.* at 147. "The bottom line," said the court, was "that the ALJ and the Secretary may well be right in their legal analysis. If so, that position will be vindicated upon further appeal. But they are dead wrong in the ill-conceived assumption of a power not properly theirs." *Id.* at 148. Having concluded that law of the case precluded relitigation of issues settled by the district court's prior order, the court remanded to the Agency for the immediate award of benefits.[7] *See id.*

 In the absence of binding authority, the Court finds the logic of *Holst* to be persuasive, and concludes that the doctrine of the law of the case and the rule of mandate apply to matters remanded to the Agency for further proceedings. The Ninth Circuit's assessment of the policies that underlie the doctrine support this conclusion:

---

7. Outside the Ninth Circuit, several circuits have held that the doctrine of the law of the case and the rule of mandate apply to Social Security proceedings. *See Key v. Sullivan,* 925 F.2d 1056, 1062 (7th Cir.1991)(concluding that the ALJ exceeded the scope of his remand order and violated the law of the case by reassessing the claimant's past relevant work or residual functional capacity, when the court's remand instructions only instructed "the Secretary to make a finding as to the physical and mental demands of the assembler job in relation to [the claimant's] present capabilities"); *Hooper v. Heckler,* 752 F.2d 83,

87–88 (4th Cir.1985)(finding that the ALJ violated the rule of mandate by relitigating an issue decided by the district court); *Mefford v. Gardner,* 383 F.2d 748, 756 (6th Cir. 1967)(same). Persuaded by some of these authorities, district courts outside those circuits recently have invoked these principles against the Agency to rein in ALJs who disregard their remand instructions. *See Williams v. Apfel,* 65 F.Supp.2d 1223, 1229 (N.D.Okla. 1999); *Latulippe v. Commr., SSA,* No. 95–82–SD, 1996 WL 360363, at *6 (D.N.H. March 7, 1996).

The doctrine [of the law of the case] is a judicial invention designed to aid in the efficient operation of court affairs, and is founded upon the sound public policy that litigation must come to an end. Further, the doctrine serves to advance the principle that in order to maintain consistency during the course of a single lawsuit, reconsideration of legal questions previously decided should be avoided.

*United States v. Smith,* 389 F.3d 944, 948 (9th Cir.2004) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 125 S.Ct. 1721, 161 L.Ed.2d 538 (2005). These same policies justify enforcing the rule of mandate to ensure that ALJs comply with their remand instructions.

The Agency argues, however, that 20 C.F.R. § 404.983—which provides that "[a]ny issues relating to [the] claim may be considered by the administrative law judge whether or not they were raised in the administrative proceedings leading to the final decision in [the] case"—renders inapplicable the doctrine of the law of the case (and, by extension, the rule of mandate). (*See* Cross–Motion at 5). One problem with this contention is that another, equally-binding regulation provides that "[t]he [ALJ] shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." *See* 20 C.F.R. § 404.977(b). In this case, the Appeals Council "remand[ed] the case to an [ALJ] for further proceedings *consistent with the order of the court.*" (*See* AR 583 (emphasis added).) In light of the Appeals Council's unambiguous order, any argument that the law of the case did not bind the ALJ to follow this Court's remand instructions would be contrary to the Appeals Council's order. Another flaw in the Agency's argument is that its ALJs have acknowledged throughout the years that the remand instructions they receive from the federal district court *are* the law of the case. *See Holst,* 637 F.Supp. at 147 n. 3 (noting the ALJ's acknowledgment that the doctrine of the law of the case bound him to follow the district court's remand orders); *see also Ozbun v. Callahan,* 968 F.Supp. 478, 480 (S.D.Iowa 1997)(noting that "[t]he Secretary has acknowledged in prior cases that he is bound on remand to follow the law of the case doctrine")(citing *Hillhouse v. Harris,* 547 F.Supp. 88, 92 (W.D.Ark.1982)).

■■ The Agency maintains that, even if the doctrine of the law of the case does apply, the ALJ could revisit Plaintiff's residual functional capacity because that issue "was never adjudicated by the courts." (Cross–Motion at 2.) This argument misses the point. The doctrine does not require that any issue actually have been adjudicated; rather, it applies to this Court's "explicit decisions as well as *those issues decided by necessary implication.*" *United States v. Cote,* 51 F.3d 178, 181 (9th Cir.1995)(emphasis added). In her Order of June 15, 1999, Magistrate Judge Jones found that "the ALJ erred in his conclusion that [P]laintiff had the residual functional capacity to perform his past work," (AR 394) and specifically found that the evidence was sufficient to support the conclusion that he could not return to his former work. (*See* AR 391.) A ruling that the evidence is sufficient to support some finding is the type of ruling that establishes the law of the case. See *Fadhl v. City and County of San Francisco,* 804 F.2d 1097, 1099 (9th Cir.1986).

■ The Agency further contends that the "identical" or "same case" requirement has not been met because Magistrate Judge Jones's Order of June 15, 1999 operated as a final judgment divesting the Court of jurisdiction. (*See* Cross–Motion at 2.) The Court is unpersuaded. Here, Plaintiff argues the doctrine of the law of

the case bound the ALJ to follow not only Magistrate Judge Jones's June 15, 1999 Order, but also obliged him to execute the specific instructions contained in this Court's December 12, 2001 Order on remand. (*See* Motion at 8.) The United States Supreme Court and the Ninth Circuit alike have recognized that an action brought following a reversal and remand for further proceedings in the same litigation is the same case for purposes of application of the law of the case doctrine. *See Hartford Life Ins. Co. v. Blincoe*, 255 U.S. 129, 136, 41 S.Ct. 276, 65 L.Ed. 549 (1921); *see also Hansen & Rowland v. C.F. Lytle Co.*, 167 F.2d 998, 998–999 (9th Cir.1948). Any argument that this Court's December 12, 2001 Order could be anything *but* part of the "same case" before the ALJ on remand must be rejected, particularly because the ALJ himself acknowledged the sway of that Order.[8] (*See* AR 464.)

■ Given that this Court's remand instructions are undeniably part of the same case, there is no way around the conclusion that the ALJ's third decision violated not only the law of the case as set forth in Magistrate Judge Jones's Order of June 15, 1999, but also exceeded the mandate of the December 12, 2001 Order. The remand stipulation that the parties proposed to this Court came in the wake of the ALJ's second decision, which had held that Plaintiff had met his burden of proof as to steps one through four of the sequential process, but that he was not disabled at step five. (*See* AR 298–305.) The stipulation nowhere indicated that remand was necessary to enable the ALJ to revisit any of the findings he had made in steps one through four of the second decision. Instead, the stipulation provided only that remand was necessary for the ALJ to obtain additional evidence on one narrow issue:

> On remand, the [ALJ] will be directed to obtain further vocational expert testimony to assist the ALJ in resolving the issue of vocational adjustment. The ALJ will include all of [P]laintiff's exertional nonexertional [*sic*] limitations in the hypothetical questions asked of a different vocational expert.

(AR 577–78.) The regulations place a claimant's vocational adjustment squarely within step-five of the sequential process:

> At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

*See* 20 C.F.R. § 404.1520(a)(4)(v). Thus, given that the scope of the remand order

---

8. This conclusion is unaffected by the fact that the Appeals Council eventually vacated the ALJ's first and second decisions. The Appeals Council initially affirmed *both* decisions, (*see* AR 3–4, 585–87), and only vacated them *after* this Court remanded on June 15, 1999, and again on December 12, 2001. (*See* AR 382–83, 583–84.) Addressing the identical situation, *Holst* noted:

> [T]he Appeals Council did not vacate its previous affirmance of the ALJ until *after* this Court reviewed the record and remanded. If the authorities cited *infra* [*i.e.*, regarding the doctrine of the law of the case] mean anything at all, they stand for the proposition that the Appeals Council's purported vacation came too late in the game. Any other answer would render the judicial review process a nugatory exercise in futility.

*Holst*, 637 F.Supp. at 146 n. 2 (emphasis in original); *see also Ruiz*, 24 F.Supp.2d at 1050 (rejecting the Agency's argument that "the Appeals Council's order vacating the prior decision and remanding the case 'for further proceedings consistent with the order of the court' suggest[ed] that review beyond the scope of the court's order was permitted or contemplated.")

was so narrow as to permit the ALJ to revisit a step-five issue, it was clear that the remand was *solely* for purposes of permitting the ALJ to re-determine whether Plaintiff was disabled at step five.[9] In approving the stipulation, the only thing that this Court authorized the ALJ to do on remand was to take additional evidence on the step-five issue of Plaintiff's amenability to vocational adjustment, and, by implication, to modify as necessary the step-five analysis he had produced in the second decision to whatever extent necessary in light of that new evidence. *See United States v. Pimentel*, 34 F.3d 799, 800 (9th Cir.1994)(holding that remand on a single sentencing issue limited the district court's authority to that one issue). The stipulated remand did *not* entitle the ALJ to disturb or revisit his analysis through step four of the sequential process. The ALJ acknowledged this in the ultimate paragraph of his ultimate decision, but said:

> The stipulation to remand in this case was based on a necessity to clarify issues of vocational adjustment to other work to which [Plaintiff] was found to have transferable skills. However, the issue is now moot given evidence that [Plaintiff] has the residual functional capacity to perform his prior work.

(AR 466.) It was not for the ALJ to decide that his marching orders—agreed-upon by stipulation of the parties and ordered by this Court—limiting his review to a single issue were "moot." [10] When the ALJ received this Court's remand Order, he was not entitled to "intermeddle with it, further than to settle so much as has been remanded." *See In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895). The fact that the ALJ produced a third decision out of whole cloth and rested at step four of the analysis is a general violation of this Court's mandate on remand, and a specific violation of the doctrine of the law of the case.

The applicability of the doctrine of the law of the case and the rule of mandate to this dispute does not end the inquiry, however. The doctrine of the law of the case is not a limitation on a tribunal's power, but rather a guide to discretion. *See Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); *see also United States v. Mills*, 810 F.2d 907, 909 (9th Cir.1987)(stating that law of the case is a discretionary doctrine and declining to apply the doctrine). That discretion is, however, limited. *See Bible*, 983 F.2d at 155. The Ninth Circuit has identified only five circumstances under which a court may have discretion to depart from the law of the case:

> 1) the first decision was clearly erroneous; 2) an intervening change in the law

---

**9.** It is worth reiterating that the issue of Plaintiff's ability to return to his prior job was put to rest by Magistrate Judge Jones's June 15, 1999 Order. Neither party appealed that order, and neither party has argued that this Court's Order of December 12, 2001 disturbed this or any other finding settled in that earlier order. Any argument along those lines would be indefensible. *See Tanner Motor Livery, Limited v. Avis, Inc.*, 316 F.2d 804, 810 (9th Cir.1963)("Orders of United States Courts, deliberately made, after proper notice and hearing, and subject to review by this Court, are not to be lightly changed by any judge of the trial court.").

**10.** Incidentally, this is not the first time that the ALJ has treated one of this Court's orders as "moot." In her June 15, 1999 Order, after noting that "the ALJ did not proceed to step five of the sequential evaluation process," Magistrate Judge Jones instructed him to "complete the five-step evaluation" on remand. (AR 394.) That Order made it clear that, whatever else the ALJ did on remand, he was *not* to revisit step four. Nevertheless, instead of merely completing the step-five process as he was instructed, the ALJ repeated the entire process from step one. (*See* AR 298–305.)

has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.1997). "Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* (citing *Bible*, 983 F.2d at 155). Although the Ninth Circuit has yet to permit the departure from the rule of mandate in these five situations, in light of the Supreme Court's recognition that lower courts are "bound by the decree as the law of the case, and must carry it into execution *according to the mandate*," see *In re Sanford Fork & Tool*, 160 U.S. at 255, 16 S.Ct. 291 (emphasis added), the Court will assume for the sake of argument that at least some of these five situations theoretically could justify relaxation of the rule of mandate.[11]

 Although the Agency does not argue the point directly, it suggests that the new evidence provided by vocational expert Steven Berry at the fourth hearing justified a departure from the law of the case. (*See* Cross–Motion at 4.) This new evidence was, indeed, the only reason that the ALJ gave for disregarding the Court's order. (*See* AR 466.) Assuming that the Agency intends to argue that the third *Alexander* factor warranted departure from the doctrine—*i.e.*, that the post-remand evidence regarding his ability to return to his former job was substantially different from the evidence that the ALJ heard pre-remand—the argument is ill-taken.

In her June 15, 1999 Order, Magistrate Judge Jones found that, in light of the testimony obtained at the first hearing, the "evidence supports the conclusion that [P]laintiff would be precluded from performing any of his prior work." (*See* AR 391.) Subsequently, Ms. Hetrick (the vocational expert who testified at the second hearing) agreed that Plaintiff could not perform his prior work. (AR 371.) In the ensuing second decision, the ALJ determined that Plaintiff "can perform light exertional work that involves a slight amount of stress."[12] (AR 303.) In light

11. Other circuits have tested the flexibility of the rule of mandate by criteria similar to those that channel the discretionary application of the law of the case doctrine. *See United States v. Webb*, 98 F.3d 585, 587 (10th Cir.1996)(noting that deviation from the rule of mandate requires "exceptional circumstances, including (1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) if blatant error from the prior ... decision would result in serious injustice if uncorrected"). Although the Ninth Circuit's Bankruptcy Appellate Panel recently noted that "the 'mandate rule' is but a specific application of the law of the case doctrine," and cited out-of-circuit authority for the proposition that the rule is subject to the same exceptions as those that govern deviation from the law of the case, *see In re Fraschilla*, 235 B.R. 449, 458 n. 3 (9th Cir.BAP1999) (citation omitted), it appears unlikely that the Ninth Circuit would import all of the *Alexander* criteria into the rule of mandate. *See Firth v. United States*, 554 F.2d 990, 994 n. 4 (9th Cir.1977)(noting that a district court must carry out the mandate of a court of appeals, even if the mandate was in error).

12. Although the Agency correctly insists that "[t]he parties did not agree that the ALJ's finding that Plaintiff retained the [residual functional capacity] to perform light work [*i.e.*, in the second decision] should stand," (*see* Cross–Motion at 4), this begs the question: for neither did the parties agree that the ALJ could revisit his assessment of Plaintiff's residual functional capacity or reopen his step-four finding that Plaintiff could not resume his previous work. The parties' failure to include these issues in their remand stipulation—which, incidentally, the United States Attorney's Office evidently drafted on behalf of the Agency, (*see* AR 577)—means that the ALJ could not use the remand as an excuse to

of that limitation, the ALJ accepted Ms. Hetrick's "testi[mony] that [Plaintiff] would be unable to perform his past relevant work" as both "credible and consistent with the record," the ALJ himself concluded in his second decision that Plaintiff could *not* return to his prior work. (AR 302.) Following this Court's December 12, 2001 remand Order, both Mr. Leeth and Mr. Berry testified that— given the limitation to work involving no more than a slight amount of stress that the ALJ had found in his second decision—Plaintiff could neither return to his prior job nor perform other work in the national economy. (*See* AR 614–15, 648–49.) In light of this testimony, the Court cannot say that the pre— and post-remand evidence was different at all: let alone "substantially different" sufficient to justify a departure from the law of the case, *see Alexander*, 106 F.3d at 876, or from the rule of mandate.

Even if Mr. Berry's testimony about the step-four issue of Plaintiff's ability to return to his prior jobs had been "substantially different," equitable concerns would persuade this Court to exercise its discretion in favor of applying the law of the case and the rule of mandate. The law of the case is, after all, an equitable doctrine. *See Rent–A–Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 602 (9th Cir.1991). Here, the ALJ never would have heard Mr. Berry's testimony had he not rejected that of Mr. Leeth at the third hearing. (*See* AR 465, 621–22.) But the ALJ's rejection of Mr. Leeth's testimony was erroneous as a matter of law.[13] Although the ALJ purported to offer two substantive reasons for dismissing Mr. Leeth's testimony, neither reason was supported by the record.[14] Indeed, these weak substantive criticisms appear to be window-dressing for the ALJ's real objection to Mr. Leeth, which was this:

> Mr. Leeth is on a list of potential vocational expert witnesses certified by the Office of Hearings and Appeals as meeting the minimum requirements to give testimony. Vocational experts are randomly assigned on a rotating basis. There is no qualifying process. Virtually all who submit applications with the requisite diplomas, certificates, and re-

---

overrule himself on these or other matters outside the mandate. The Agency has not argued that the assessment of Plaintiff's residual functional capacity in the second decision was unsupported by substantial evidence.

**13.** The substantial evidence test is limited by the language of 42 U.S.C. § 405(g) to "the findings of the secretary as to any fact." A different standard of review applies to conclusions of law, which are fully reviewable by this Court. "The administrative determination of the law is entitled to great weight, but it is not binding on this court." *Davis v. Mathews*, 450 F.Supp. 308 (E.D.Cal.1978). The determination as to who "is a qualified vocational expert is a conclusion of law, subject to a much broader review by this court." *Id.* at 313.

**14.** The ALJ claimed to reject Mr. Leeth's opinion in part because he supposedly "testified that managerial work was more physically demanding than jobs involving manual labor." (AR 465.) This criticism misstates the record. A fairer interpretation of what Mr. Leeth actually testified is that—for a person with Plaintiff's stress limitation—a lower stress, higher exertion job might be easier to handle than a higher stress, lower-exertion job. (*See* AR 613–14.) That observation seems logical to this Court. The ALJ also faulted Mr. Leeth for being unable to state the DOT code number for Plaintiff's past relevant work. (AR 465.) This also misstates the record, which instead shows that Mr. Leeth *was not asked* for the DOT code number. (AR 608.) Even if one assumes that Mr. Leeth had been unable to recall the DOT code number, this was not a principled basis for the ALJ to reject his testimony in favor of Mr. Berry's opinion: who also had difficulty producing DOT information when questioned about it at the fourth hearing. (*See* AR 641–43.)

sumes are accepted and placed on the list of potential witnesses. There is no certifying or continuing education process. So, some vocational experts are better than others. Some give more useful, probative testimony. Some have access to and use better equipment than others, such as laptop computers and Department of Labor statistics. In this case, Mr. Leeth's testimony was of limited value. He is an ADA (Americans with Disabilities) employee of the Administration. He has limited resources, no computer and cannot use his hands to lift books or turn pages. He is paraplegic and permanently confined to a wheelchair.

(AR 465.) Putting aside the spectacularly-offensive nature of this explanation, it is further evidence that the ALJ abdicated his duty to assess *the claimant's* disability, not that of the Agency's expert or any other witness who appeared at the hearing. At any rate, the ALJ's explanation proves too much. If a vocational expert's *own* disability could disqualify him from testifying about the disability of a claimant in an Agency proceeding, as the ALJ suggested, then Mr. Leeth would be unqualified to testify as an expert in *any* Agency proceeding. As the ALJ conceded, however, the Agency's Office of Hearings and Appeals determines the qualifications of its experts. (AR 465.) The fact that Mr. Leeth met the Agency's qualifications settled this issue, and the ALJ had no business second-guessing it.[15]

The Court's inclination to apply the law of the case and enforce its mandate is reinforced by the fact that the ALJ's conduct at the third and fourth hearings reveals that he did not stumble onto this new evidence in the course of fulfilling this Court's mandate on remand. Instead, the very first hypothetical that the ALJ posed to Mr. Leeth at the third hearing asked whether Plaintiff could perform his old jobs, (*see* AR 608–09), the very issue that Magistrate Judge Jones's Order settled in 1999. Evidently unhappy with Mr. Leeth's conclusions, the ALJ ordered a fourth hearing for the sole purpose of obtaining testimony from a different vocational expert. (*See* AR 621–23.) There, again, the ALJ's first hypothetical to Mr. Berry asked whether a hypothetical person with Plaintiff's impairments and limitations could "perform [Plaintiff's] past relevant work?" (AR 634.) Only after the ALJ obtained this testimony did he render his third decision, in which he revealed for the first time the reason for the fourth hearing, rejected Mr. Leeth's testimony, indulged in a selective reading of Mr. Berry's testimony, and found Plaintiff not disabled at step four. (*See* AR 465–66.) Where the conduct of the ALJ betrays a clear mission to manipulate the evidentiary process to obtain the result he wants, reversal is appropriate.[16] *See Brown v. Bowen,* 682 F.Supp. 858, 859 (W.D.Va.1988)(reversing for the award of benefits where the ALJ on remand manipulated the vocational expert to obtain testimony consistent with his belief that the claimant was not disabled).

---

**15.** If a party fails to object to an expert's qualifications at the hearing, he waives the right to challenge them. *See Mason v. Apfel,* No. CIV. 99–01583 WHA, 2000 WL 126127, at *4 (N.D.Cal. Jan.20, 2000). If the ALJ doubts the qualifications of an Agency expert, it is reasonable to expect him to make a record of his concerns at the hearing. The ALJ in this case did not.

**16.** Although this issue is related to Plaintiff's contention that the ALJ "engaged in impermissible expert shopping," (*see* Motion at 14), the Court views the ALJ's post-remand conduct as part and parcel of his general disregard for the confines of his mandate.

In the end, by disregarding this Court's remand instructions, arrogating unto himself the power to disqualify experts, and manipulating the post-remand evidentiary process, it seems clear to this Court that the ALJ elected to keep conducting hearings until he received testimony consistent with his preordained conclusion that Plaintiff could return to his previous job. Undeniably, "some vocational experts are better than others," as the ALJ observed. (AR 465.) But having, by the luck of the draw, been assigned a vocational expert who testified that Plaintiff was totally disabled, the ALJ was not entitled to contrive legally-insufficient reasons for dismissing that testimony and then "reshuffle the cards after the plaintiff was dealt a winning hand." *Skelton v. Bowen*, 668 F.Supp. 629, 630–31 (N.D.Ohio 1987)(finding that the Agency "exceeded the Court's remand order when it found that [the] claimant was capable of performing her past relevant work" and concluding that the Agency unreasonably acted "inconsistently with its own prior decision"). Indeed, this is the sort of thing that Magistrate Judge Jones instructed the ALJ *not* to do when she remanded this matter to him the first time. (*See* AR 392.) For these reasons, the doctrine of the law of the case and the rule of mandate compel the conclusion that the ALJ abused his discretion to the extent that he took evidence on matters beyond the single issue identified in this Court's Order of December 12, 2001.[17]

## B. *Remand For The Award Of Benefits Is Appropriate*

This Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." *See* 42 U.S.C. § 405(g). The determination whether to remand for further proceedings or for payment of benefits lies within the discretion of the Court. *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.1989).

 The usual remedy in Social Security disability cases is remand with instructions to conduct further administrative proceedings. *See Moisa v. Barnhart*, 367 F.3d 882, 886–87 (9th Cir.2004). Further administrative proceedings are not appropriate, however, when enhancement of the record would not be useful. *See Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir.2004). As *Benecke* explained:

> [T]he district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. Where [this] test is met, we will not remand solely to allow the ALJ to make specific findings regarding excessive pain testimony. Rather, we take the relevant testimony to be established as true and remand for an award of benefits.

*Id.* (citations omitted).

In Plaintiff's case, all three of the *Benecke* criteria are met. As explained above, the ALJ did not provide legally

---

**17.** Because the Court finds that the ALJ's reassessment of Plaintiff's residual functional capacity in his third decision violated the doctrine of the law of the case and the rule of mandate, the Court need not reach Plaintiff's argument that the ALJ's assessment of his residual functional capacity in that third decision also violates the regulations. (*See* Motion at 13–14.)

sufficient (or even factually defensible) reasons for rejecting the testimony of Mr. Leeth at the third hearing. That being so, this Court must "credit the evidence as true" and determine that Plaintiff is unable to make the vocational adjustment to other work. (*See* AR 611.) Nor do any factual issues await resolution: the stipulated remand order was confined to this issue. (*See* AR 578.) Finally, it is clear to the Court that, if Mr. Leeth's testimony is credited, the ALJ would be required to find Plaintiff disabled at step five of the sequential process. In the second decision, the ALJ determined that Plaintiff "can perform light exertional work that involves a slight amount of stress." (AR 303.) Following this Court's December 12, 2001 remand, both Mr. Leeth and Mr. Berry testified that, given this limitation, Plaintiff could not perform other work in the national economy. (*See* AR 614–15, 648–49.) Thus, the immediate award of benefits is appropriate. *See Benecke,* 379 F.3d at 596.

Even if the Court were inclined to remand the matter for a fifth hearing, the ALJ's repeated disregard of court-ordered remand instructions inspire no confidence that a remand would serve any useful purpose. More than six years ago, Magistrate Judge Jones specifically advised this ALJ that he was not entitled to "reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result." (*See* AR 392 (quoting *Gallant v. Heckler,* 753

F.2d 1450, 1455–56 (9th Cir.1984)).) Yet the ALJ's orchestration of the fourth hearing and his contrived reasons for rejecting the evidence from third hearing show that this Court's orders were simply ignored. Accordingly, the Court remands, with instructions to calculate and award Plaintiff SSI and DIB for the period spanning April 5, 1994 through December 31, 1998.[18]

## V.

## CONCLUSION

For all the foregoing reasons, the Agency's decision is reversed and the case is remanded to the Agency for the immediate payment of benefits consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

---

**18.** Many claimants apply for both DIB and SSI concurrently, as Plaintiff has here. *See, e.g., Guadamuz v. Bowen,* 859 F.2d 762, 764 (9th Cir.1988). Under Title II of the Act, 42 U.S.C. § 401 et. seq., covered wage earners are eligible for DIB. Eligibility for Title XVI SSI benefits is based on economic need; the more "chargeable" income a claimant has, the less SSI benefits he will receive. *See* 42 U.S.C. § 1382(a)(2). The definition of "disability" is virtually identical for SSI consider-

ation as it is for DIB. *See Penny v. Sullivan,* 2 F.3d 953, 955 n. 1 (9th Cir.1993). In Plaintiff's case, the ALJ specifically found that he had been covered for DIB through December 31, 1998. (*See* AR 465.) Whether Plaintiff meets the means test for SSI is not the issue before this Court. Instead, the Court only has determined that Plaintiff meets the definition of "disabled" (*i.e.,* unable to perform substantial gainful activity) such that he must be considered for SSI benefits.